IN THE MATTER OF EDWARD J. DOLAN,
AN ATTORNEY AT LAW.

Argued January 11, 1977—Decided April 5, 1978.

(1)

*Mr. Nino D. Caridi* argued the cause for Central Ethics Unit.

*Mr. John J. Pribish* argued the cause for respondent.

PER CURIAM. A complaint was filed with the Middlesex County Ethics Committee charging respondent with conflicts of interest in connection with certain real estate transactions. After receipt of the Committee's report the Court directed the Central Ethics Unit to file a petition for an Order to Show Cause, which issued in due course. That petition asserts that respondent's conduct constituted violations of DR 5–105, DR 8–101, and DR 9–101, dealing respectively with conflicts, abuse of public position, and the appearance of impropriety.

I

The public position which respondent held during the times pertinent hereto was that of municipal attorney for the Borough of Carteret, to which he was appointed at the beginning of 1971. For some time prior to the events in question the Borough had implemented a policy of urban renewal pursuant to Federal Housing Authority (FHA) procedures. By ordinance it created the Carteret Redevelopment Agency (Agency), consisting of six members, five of whom were appointed by the municipal governing body. The Agency's function was to solicit proposals from developers for utilization of certain tracts for low and moderate income multi-family dwelling units. Gulya Brothers, Inc., a developer, submitted a proposal for a townhouse project on one of the tracts, which the Agency accepted. Thereafter,

on April 5, 1971, Gulya Bros. Redevelopment Corp. (Gulya) was established for the purpose of purchasing the land from the Agency and developing it, and marketing the townhouses which it erected thereon.

Upon acceptance of Gulya's proposal the Agency was required to obtain the necessary approvals from the municipal planning board, board of adjustment and governing body. Additionally, it was obliged to convey to the developer marketable title to the tracts involved. In due course the Agency, which was represented by its own counsel, successfully processed applications before the appropriate municipal bodies, and on November 15, 1971, the Borough gave final approval to the project.

Thereafter Gulya's attorney sought financing for the project on behalf of the developer but was unsuccessful. To aid in this endeavor the developer's attorney sought out the respondent, who had "handled matters for him in the past", was "familiar with mortgage financing", and had done "some extensive real estate work." In May or June of 1972 respondent, at the instance of Gulya's attorney, discussed the project with the principals of Gulya and at that point took over the representation of the developer, with the full consent of previous counsel. Prior to this respondent had not represented Gulya in any capacity whatsoever. Specifically, he had not appeared on the developer's behalf before the Agency; neither had he represented either the planning board or board of adjustment at the time of the Agency's applications to those bodies or at any other time. Respondent was, however, attorney for the Borough when the Council acted favorably on the board of adjustment's recommendation to grant the Agency's application for the necessary variances for this project.

Respondent's efforts on Gulya's behalf produced the required financing through a New Jersey mortgage company. The financing consisted of both the construction mortgage and permanent mortgages available to the buyers of the townhouses. Respondent's representation of the developer con-

tinued throughout the initial construction stage of the project, during which time he was, as has been indicated, attorney for the municipality in which the development was located, albeit that representation of the municipality was not in any wise in connection with any business of or application on behalf of the developer.

Respondent also represented the mortgage company in sales involving permanent mortgages used in the purchase of townhouses from Gulya. In those same transactions he came to act as well on behalf of purchasers-mortgagors of the housing units at their closings of mortgage loan and title, under the following circumstances. In order to market the townhouses the developer engaged a real estate agent, whose function it was to attract buyers and assist those buyers in obtaining FHA approvals. It was the agent who led the buyers through whatever preliminary steps were required leading to execution of the contracts, and it was the agent who secured execution of those contracts. Respondent did not enter the picture until after the contracts had been signed by the buyer. The contract forms utilized by the agent, pursuant to these procedures, contained the following clauses:[1]

Purchaser shall be responsible for paying the closing attorneys for the mortgage (sic) their legal fee for examination of title and recording of deed and mortgage and shall also be responsible for and shall pay for survey, mortgage title insurance; hazard insurance premium, escrow funds for taxes and insurance, appraisal and inspection fees and a one percent processing fee except as may be otherwise provided herein. * * *.

\* \* \* \* \* \* \* \*

If purchaser uses seller's attorney, the seller will pay the legal fee for title examination, recording of deed and mortgage, survey, mortgage title insurance, appraisal and inspection fees.

---

[1]These clauses have not been directly attacked in these proceedings and we do not pass on their propriety.

By virtue of the arrangement last referred to either respondent or an associate in his office attended closings not only for the seller in sixteen instances, but also for the purchasers-mortgagors in at least fourteen of those closings.[2] At these closings purchasers were notified for the first time of the potential conflicts of interest arising out of respondent's multiple representations. They were presented with and executed two separate waiver and consent forms, one acknowledging and approving respondent's representation of purchaser and seller and the other acknowledging and approving his representation of mortgagor, mortgagee and seller.

As may be seen, then, there are two separate areas of potential conflict of interest called to our attention by the Committee report and the Central Ethics Unit's presentment.[3] The first centers about respondent's representation of the builder-developer while at the same time serving as attorney for the Borough of Carteret. The second focuses on his representation at the closing of the seller, the purchasers-mortgagors and the mortgagee under circumstances casting doubt on the informed nature of the consents given by the buyers to this multiple representation.

## II

We address first the asserted conflict presented by respondent's representation of the developer while concurrently act-

---

[2]In a letter answer to the complaint, marked in evidence at the Committee's hearing, respondent indicated that "one or two of the people did bring their own attorney to the closing."

[3]A third area emerges, although it was not touched upon in the complaint, testimony, report or presentment. It is the arrangement under which respondent represented both Gulya and the mortgage company with respect to the construction mortgage — again at a time when he was municipal attorney. Much of the thrust of this opinion can be directed with equal force to that relationship even though it has not been presented to us directly.

ing as borough attorney. Respondent points out that at no time did his representation of Gulya involve any dealings or transactions with the Borough. All applications to municipal boards necessary to permit the Agency to convey clear title to the developer had been completed before respondent's representation of the developer commenced. Throughout the course of negotiations with the Agency involving Borough-related matters, Gulya was represented by its own attorney who eventually called on respondent for assistance when financing loomed as an obstacle.

With all of this, however, the fact remains that respondent's conduct was directly contrary to the mandate of this Court in *In re A. and B.*, 44 *N. J.* 331 (1965). There it was noted that while in some situations it may be proper (within the proscription of DR 5–105) for an attorney to engage in dual representation, nevertheless

the subject of land development is one in which the likelihood of transactions with a municipality and the room for public misunderstanding are so great that a member of the bar should not represent a developer operating in a municipality in which the member of the bar is the municipal attorney or the holder of any other municipal office of apparent influence. We all know from practical experience that the very nature of the work of the developer involves a probability of some municipal action, such as zoning applications, land subdivisions, building permits, compliance with the building code, etc.

It is accordingly our view that *such dual representation is forbidden even though the attorney does not advise either the municipality or the private client with respect to matters concerning them. The fact of such dual representation itself is contrary to the public interest.* [44 *N. J.* at 334–35 (emphasis added).]

While in a sense this rule may be deemed somewhat harsh, particularly in a situation where, as here, the representation of both municipality and developer was at no time in connection with a transaction involving both clients, we are strongly of the view that the public interest demands strict adherence to the letter of *In re A. and B., supra. A* municipal attorney's public obligations are such that he must

take particular pains to avoid the shadow of suspicion which inevitably is cast when he begins to entangle himself in a representative capacity in the legal affairs of a developer operating within the municipality. If the municipal attorney is not a full-fledged member of the "municipal family," he is least in such a close and confidential relationship with it as to warrant his not representing those who may benefit (or, as here, have already benefitted) from successful applications by others (here, the Agency) to the planning board and zoning board of adjustment.

In this case the affirmative action of those municipal boards, while made at the Agency's behest, inured to the benefit of Gulya. Those applications were, in a very real sense, in Gulya's interest, were made at a time when respondent represented the Borough, and were then followed by respondent's representation of Gulya in connection with the same development project. This representation ignored the clear admonition of *In re A. and B., supra,* and hence merits our disciplinary action.

## III

We turn our attention to the conflict presented by respondent's multiple representation of seller, purchaser-mortgagor, and mortgagee.[4] At the outset we recognize the emphasis that our disciplinary rules place on the desirability of completely independent counsel. Specifically, DR 5–105 prohibits multiple representation except under certain se-

---

[4]In an analogous context, the not uncommon practice by some lending institutions of requiring real estate mortgagors to be represented by the lender's attorney has not gone unnoticed by the Legislature. *N. J. S. A.* 46:10A–6 prohibits such a practice in a mortgage loan transaction where the mortgagee is a consumer. Senate Bill 35, an amendment to this statute which has passed the Senate and is now before the Assembly Banking and Insurance Committee, expands the scope of the statute to prohibit such a practice in all mortgage loan transactions, regardless of whether the mortgagee is a consumer or a commercial party.

verely circumscribed circumstances.[5] See *In re A. and B., supra,* 44 *N. J.* at 335 (Schettino, J., concurring). The sense of our rules is that an attorney owes complete and undivided loyalty to the client who has retained him. The attorney should be able to advise the client in such a way as to protect the client's interests, utilizing his professional training, ability and judgment to the utmost. Consequently, if any conflicting interest could arise which would stand in the way of that kind of unstinting zeal, then the client must be so informed and the attorney may continue his limited representation only with the client's informed consent.

In a real estate transaction, the positions of vendor and purchaser are inherently susceptible to conflict. *In re Kamp,* 40 *N. J.* 588, 595 (1963). This is likewise the case with a borrower-lender relationship. *Id.* at 596. The requirements of an attorney involved in such multiple repre-

---

[5]DR5-105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

(C) In situations covered by DR 5-105(A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, no partner or associate of his or his firm may accept or continue such employment.

sentations of purchaser, vendor and mortgagee are set out in Justice Proctor's opinion in *In re Kamp, supra*, where he said:

Full disclosure requires the attorney not only to inform the prospective client of the attorney's relationship to the seller, but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer have independent counsel. The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent. If the attorney cannot properly represent the buyer in all aspects of the transaction because of his relationship to the seller, full disclosure requires that he inform the buyer of the limited scope of his intended representation of the buyer's interest and point out the advantages of the buyer's retaining independent counsel. A similar situation may occur, for example, when the buyer of real estate utilizes the services of the attorney who represents a party financing the transaction. To the extent that both parties seek a marketable title, there would appear to be no conflict between their interest. Nevertheless, a possible conflict may arise concerning the terms of the financing, and therefore at the time of the retainer the attorney should make clear to the buyer the potential area of conflict. In addition, if the buyer's interests are protected only to the extent that they coincide with those of the party financing the transaction, the attorney should explain the limited scope of this protection so that the buyer may act intelligently with full knowledge of the facts.

[40 *N. J.* at 595–96.]

See also N. J. Advisory Committee on Professional Ethics, *Opinion* 51, 87 *N. J. L. J.* 705 (1964).

In the application of these principles to the matter before us we are mindful of the circumstances surrounding this type of transaction, namely, the purchase of low and moderate income dwellings with federally guaranteed financing, which serve to distinguish it from the conventional transfer of real estate. There is less flexibility in the terms. Federal auspices in this context brings with it a certain rigidity which leaves little room for negotiation of price and such other commonly negotiable features as limits and rates on borrowed money. The prescribed forms for bond and mortgage contain fixed terms from which variance is

rarely, if ever, permitted. Nevertheless, the severely strictured nature of the relationship between mortgagor and mortgagee in no wise serves to diminish the essential obligation of full and timely disclosure. The opportunity for conflict to arise — for instance, in terms of a condition of title acceptable to one party but not the other — while perhaps remote is by no means non-existent. More apparent is the possibility that as between buyer and developer-seller there may ripen some disagreement respecting the physical condition of the premises. Without presuming to suggest an exhaustive list of potential areas of conflict, we draw attention to these as the kinds of matters of which consenting purchasers-mortgagors should be made aware before they consent to the attorney representing another party to the transaction.

Here the consent forms executed by purchasers at the eleventh hour amounted to little more than a perfunctory effort formally to comply with *Kamp's* admonition. After the respondent was retained, he had an "immediate" duty to explain to the client the nature of his relationship with the seller and inform the client of the significance of any consent that the client may have given to dual representation. *In re Kamp, supra,* 40 *N. J.* at 596; see *In re Lanza,* 65 *N. J.* 347, 350–51 (1974).

The problems that can arise from the failure to heed that instructive warning are graphically demonstrated in the matter before us. The record reveals that a purchaser objected to signing one of the consent forms after the conflict of interest situation had been explained to him (because he believed it might place him in the position of approving a conflict which was "illegal"), but ultimately he executed the form as the result of persuasion from his wife and a desire to avoid the serious disruption of his moving plans resulting from any adjourned or cancelled closing. Although we agree with the Committee's conclusion that the consent form was signed voluntarily in the literal sense that neither respondent nor the seller exerted any overt

pressure on the client, nevertheless we are left with the impression, as was the Committee, that execution of the form was due more to the exigencies of the situation than to an unfettered will. And this need not and should not have been. The circumstances surrounding the execution of the consent form in this instance and in every other instance where the forms were executed in like fashion should not have been permitted to arise. The record before us reveals that respondent's office dealt with the purchasers "for several weeks before * * * the closing." Somewhere in that interval the time should have been taken and the opportunity created to explain to the purchasers the potential conflicts— the "pitfalls" — so as to allow for execution of the consent forms after due deliberation.

While the practicalities of this type of purchase may generate joint representation of low or middle income purchasers-mortgagors and their sellers and mortgagees by a single attorney, those practicalities in no sense justify any relaxation of the requirement of full, complete and timely explanation of the pitfalls and implications of such representation and the potential for conflict. Indeed, given the increased likelihood that this class of clients may be without the resources to obtain separate representation, the need for meticulous observance of the requirement of full disclosure and informed consent is underscored.

## IV

While tenable arguments have been made in favor of a complete bar to any dual representation of buyer and seller in a real estate transaction, see e. g., In re Lanza, supra, 65 N. J. at 353 (Pashman, J., concurring) ; In re Rockoff, 66 N. J. 394, 397 (1975) (Pashman, J., concurring), on balance we decline to adopt an inflexible per se rule. Confining ourselves to the type of situation before us (assuredly there are others, entirely unrelated to financial pressures), the stark economic realities are such that were an unyielding require-

ment of individual representation to be declared, many prospective purchasers in marginal financial circumstances would be left without representation. That being so, the legal profession must be frank to recognize any element of economic compulsion attendant upon a client's consent to dual representation in a real estate purchase and to be circumspect in avoiding any penalization or victimization of those who, by force of these economic facts of life, give such consent.

█ This opinion should serve as notice that henceforth where dual representation is sought to be justified on the basis of the parties' consents, this Court will not tolerate consents which are less than knowing, intelligent and voluntary. Consents must be obtained in such a way as to insure that the client has had adequate time — manifestly not provided in the matter under consideration — to reflect upon the choice, and must not be forced upon the client by the exigencies of the closing. This applies with equal force to the dual representation of mortgagor and mortgagee.

█ In view of respondent's impeccable record, including a history of significant public service and contributions to the legal profession, we conclude that appropriate discipline is exercised by the imposition of this public reprimand.

PASHMAN, J., concurring and dissenting. While I applaud the Court's tightening of the rules governing multiple representation in real estate transactions by further narrowing its permissible circumstantial basis, I am afraid that its effort to provide an additional safeguard for consumers of legal services simply does not go far enough. The prophylactic rule announced herein will do little to enhance the likelihood that the quality of representation provided in such circumstances will duplicate that which would be provided by counsel with undivided loyalty. Similarly, the Court's admonition that attorneys must avoid "any penalization or victimization" of clients who, as a result of economic constraints, consent to dual representation will be far from effective to prevent the various abuses endemic in such situations.

On two previous occasions I have sought to enumerate the compelling reasons supporting adoption of a *per se* rule forbidding dual representation in certain situations where an irreconcilable conflict of loyalty so inheres in the circumstances that adequate protection of the interests of each of the multiple clients is precluded. *In re Lanza,* 65 *N. J.* 347, 353 (1974) (Pashman, J., concurring); *In re Rockoff,* 66 *N. J.* 394, 397 (1975) (Pashman, J., concurring). I write now to reiterate my adherence to those principles and to note my continuing concern with the Court's present posture in this troublesome area of professional ethics. The result herein continues the Court's acceptance of dual representation in circumstances where, notwithstanding full disclosure and knowing consent by the derivative client,[1] the intrinsic degree of divided allegiance is so intolerable that the proscribed adverse effect on the exercise of the attorney's independent professional judgment on behalf of that client must *ipso facto* be conclusively presumed.[2] *See D.R.* 5–105(B). In so doing, the Court relies on the fiction that a lay client can effectively consent to dual representation and perpetuates the cruel myth that adequate representation can be provided in such cases by an attorney who supposedly can simultaneously protect the inevitably adverse interests of his two masters. The reality, of course, is that it is well-nigh impossible for the derivative client to be so well attuned to the numerous legal nuances of the transaction that his

[1]The derivative client is the client whose representation by the attorney derives from his participation in a transaction with the party who is the primary client of the attorney. The derivative client is the client to whom disclosure is made and from whom consent to the dual representation is sought.

[2]*See* New Jersey Supreme Court Advisory Committee on Professional Ethics, Opinion 212, 94 *N. J. L. J.* 553 (1971) (improper for attorney to continue to represent either party to real estate transaction after controversy has arisen between them).

consent can be said to have been truly informed.[3] The propriety of according dispositive effect to consent so obtained is further undermined when it is frankly acknowledged that the consent is induced by the derivative client's reliance on a promise by the attorney which cannot be fulfilled — the promise of adequate representation of each of his two clients.

Surely the Court is not so naive as to the economic realities of such transactions as its utopian stance would indicate. Any conflicting interests which are potentially disruptive of the ultimate goal — the expeditious consummation of the sales transaction — must inevitably be resolved in favor of the primary client and for that same reason will probably not even be brought to the attention of the derivative client. This problem is even more aggravated in circumstances such as those of the instant case where the primary client of the attorney is a developer with whom the attorney has a potentially long-term and profitable relationship. Consequently, the attorney has a substantial economic

---

[3]The most frequent topics of controversy at closing are:
A) Difficulties with the quality of title deliverable by the seller.
B) Disputes over alleged structural defects.
C) Warranties.
D) Unfinished work.
E) Leaks.
F) Cellar problems.
G) Construction of roads and sidewalks in the development on schedule.
H) Drainage problems.
I) Problems as to utilities.
J) Defective masonry foundations.
K) Mortgage and tax escrows — amount and interest.
L) Escrows of a part of seller's money to assure compliance with above problems, including schedule for release of funds.
M) Appropriate remedies for compliance with any agreements concerning the above.
There are, of course, innumerable variations of such problems within the above general areas. These are in addition to the many subjects as to which intolerable conflicts of interest result if the attorney provides dual representation at the contract negotiation stage as well as at the closing of title.

stake in maintaining the continued goodwill of this primary client. As our Advisory Committee on Professional Ethics has observed, in such situations

\* \* \* the attorney, either consciously or unconsciously, will be influenced by a desire to maintain his economically profitable, relationship with the seller. The developer has more homes to sell, hence more profitable professional employment for the attorney. The desire to maintain his relationship will make it difficult in any given case for the attorney to devote himself to the interests of a buyer with the same degree of vigor and undivided loyalty which would be the case were such desire not present. This motivation may very probably cause the attorney's representation of the buyer to be, less searching, less demanding and in general less effective than would be the case were the attorney not reluctant to risk the loss of what for him has become a profitable monopoly.

A second point, interrelated with the first, stems from the fact that the attorney acquires a very extensive intimate knowledge of the developer and of the tract in question as the result of the work he carries out for the owner. If the developer will not be able or willing to construct roads as rapidly as is represented, if a subcontractor is not doing his work well, if drainage problems exist and have not been solved, if there is a question as to when and how all utilities will be introduced, if, as an example only, the masonry foundations of various homes have proven defective, the attorney in each case will perforce possess this knowledge. These are only a few of the possibilities. Anyone who has had direct contact with projects of this sort will be able to add other examples from his own experience. Undertaking a dual representation, the attorney will find himself in an impossibly equivocal position. As representing the seller, he must use all reasonable and proper means to see that the proposed sale of his client's property is consummated; as representing the buyer, he has an obligation to reveal any information which would be of genuine interest or help to the buyer in determining whether to make the purchase and in protecting his rights after the contract has been signed. It is apparent that this twofold obligation cannot be met in circumstances where the attorney's knowledge embraces any fact, known to him as the result of his relationship with the seller, which, if known to the buyer, might influence him to reject the purchase or to insist upon terms or conditions less favorable to the seller.

As mentioned above, there is a very definite interrelationship between these two factors the existence of which we have sought to emphasize. In general they will not be present in the ordinary isolated transaction where an attorney represents both buyer and seller. On the other hand they would seem to be endemic in the kind of

situation we are considering. Accordingly, it seems clear that unless in any given case these factors for some reason fail to exist or unless their influence can be minimized to the point of complete insignificance, they constitute an *insurmountable impediment* to the kind of dual representation here being considered.

> [New Jersey Supreme Court
> Advisory Committee on Professional
> Ethics, Opinion 51, 87 *N. J. L. J.*
> 705 (1964), (emphasis added)]

Even assuming that dual representation in an "ordinary isolated" real estate transaction should not be *per se* impermissible, the practice is wholly unsupportable where the attorney involved is the representative of a developer. The attorney's economic disincentive to be vigilant in safeguarding the buyer's interests in such a case is too strong, and a *per se* prohibition is absolutely imperative. Dual representation in these circumstances forces the derivative client to play with a stacked deck. I cannot countenance the Court's continued tolerance of such farcical and often duplicitous behavior by some members of the legal profession. The injustice of this is heightened by the fact that it occurs in what for most consumers is the transaction of greatest personal and financial moment in their lifetime in which their need for adequate representation is acute.

I am similarly distressed by this Court's continuing condonation of the concept of "limited" dual representation, first sanctioned in *In re Kamp,* 40 *N. J.* 588, 595–596 (1963). By securing the derivative client's consent to such a limitation on his duty, the attorney, in addition to his plenary representation of the primary client, "represents" the derivative client also as to some matters involved in the closing of title but not as to others. In practical terms what this arrangement means is that at the settlement table, moments after having purportedly acted on behalf of the derivative client's interest, the attorney will turn on his "former" client and act solely as the advocate for the primary client as to the matters reserved from dual representation. One can readily imagine the bewilderment of the derivative client as he sees the

attorney transformed from ally to enemy in a matter of seconds. He didn't bargain for that result when he gave his "consent" to the limits of the dual representation he would receive. Agreeing to allow an attorney not to press certain matters on your behalf is not equatable with agreeing to have him press those very matters against you. This incongruous situation would be ludicrous were it not so tragic. Yet the Court sees fit to perpetuate such an arrangement, which in reality is nothing less than a travesty of the attorney-client relationship and mocks the very concept of the professionalism of lawyers. The impropriety of permitting an attorney to act as both the advocate and adversary of a client in a single transaction is too obvious even for statement.

The Court fails to make its position more palatable by noting that meaningful independent representation for the purchasers in the instant transactions would have been unlikely in any event because of the "rigidities" occasioned by the fact that the housing program involved was under "federal auspices." I am not persuaded that inadequate representation should be acceptable because on some occasions adequate representation might not bear any significant fruit.

Moreover, the Court's assumption that adoption of a *per se* prohibition of dual representation in a real estate transaction would somehow prevent persons of modest means from being represented at all is unwarranted. The more likely result of a *per se* rule will be to alert such persons to the gravity of the contemplated transaction and consequently impel them to secure their own counsel. In this regard it is not inappropriate for us to notice the greater access by consumers to information concerning the cost of legal services as a result of fee advertising in this post-*Bates*[4] era. Considering the more than adequate number of attorneys in this state, it is very likely that representation in such relatively uncompli-

<hr />

[4] *Bates v. Arizona State Bar Association*, 433 *U. S.* 350, 97 *S. Ct.* 2691, 53 *L. Ed.* 2d 810 (1977).

cated matters as residential real estate settlements at moderate fees will be readily available. Furthermore, the cost of obtaining independent counsel is normally only an incremental addition to the cost of the entire transaction and is a cost that most purchasers would willingly bear if they were aware of its potentially significant benefit. The assumption that such persons will totally forego legal representation rather than spending a relatively insignificant additional amount for an attorney is dubious at best. Naturally, many purchasers will leap at the opportunity to avoid a purportedly unnecessary extra expense when they are misled into believing that the seller's attorney can and will give them equally effective representation for free or at a lesser cost than if they obtained their own representation.[5] However, it does not necessarily follow that prohibition of dual representation will deprive most purchasers of the services of an attorney.

Were these purchasers not induced to believe that the quality of the derivative representation they would receive from the seller's attorney is the equivalent of any representation they could receive from their own counsel, it is reasonable to assume that they would have obtained independent representation. In short, the Court allows dual representation to be a self-justifying practice by accepting the theory that its *sine qua non* role in the provision of housing to per-

---

[5]In this regard it is noteworthy that in the instant case the developer's standardized agreement of sale contained the following specially inserted provision:

> If purchaser uses seller's attorney, the seller will pay the legal fee for title examination, recording of deed and mortgage, survey, mortgage title insurance, appraisal and inspection fees.

The substantial saving for the purchasers resulting from their utilization of the seller's attorney makes this offer quite persuasive, and vitiates the voluntariness of its acceptance. The Court fails to comment on the ethical implications of this clause although a functionally indistinct practice was condemned in *In re Kamp*, 40 *N. J.* 588, 598 (1963).

sons of limited means is proven by the fact that so many persons consent to it. I am unable to concur in that assessment. The incidence of exploitation of unsophisticated purchasers as a result of the conflicting loyalties of an attorney with "two clients" counsels against our making such tenuous assumptions.

It is virtually impossible for an attorney to contend for that which duty to another client requires him to oppose. This impossible fact pattern prevents the fulfillment of that undivided loyalty owed by a lawyer to his client. We must decisionally or by Canons of Ethics discourage an attorney from taking any chances where such a highly charged potential for conflict exists. Misconduct may be found despite disclosure and consent.

Absent any explicit demarcation of the line beyond which attorneys tread at their peril in this murky area of ethical behavior, I believe it is inappropriate for the Court to broaden the concept of the type of consent required to avoid a finding of impropriety and then to apply it in an *ex post facto* manner to the conduct of the particular respondent before us. Is it fair to premise a finding of misconduct on a practice whose ethically violative nature has only this day been explicitly defined? I think not, and for that reason dissent from the disciplinary action taken against Mr. Dolan for conduct only technically improper under the present state of the law and which would in all likelihood not have occurred if this Court has provided attorneys with the needed guidance in the first place. By starkly dramatizing the plethora of pitfalls which await attorneys who are foolhardy enough to chance a misstep in this precipitous area of professional ethics, this case underscores the critical need for a *per se* prohibition of dual representation which will deter attorneys at the threshold of that hazardous journey.

While I concur in the reprimand of the respondent for the conduct described in Section II of the Court's opinion, I hasten to add that my comments herein on the issue of mul-

tiple representation are not addressed to Mr. Dolan's particular conduct. It is an unfortunate fact of life that respondent is not alone in treading at the razor's edge of ethical behavior. However, as he was in technical compliance with the disciplinary rules as presently formulated, there is no valid basis for imposing any sanction for the multiple representation disclosed in this record.

PASHMAN, J., concurring in the reprimand.*

*For reprimand*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*Opposed*—None.

---

*only as to § II of the majority opinion.