**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2373-23

CAROL MORRIS STAHLBERG,
Executrix for the Estate of
BERTRAM J. STAHLBERG, and
CAROL MORRIS STAHLBERG,
Individually,

      Plaintiffs-Respondents,

v.

WALTER R. EARLE TRANSIT,
LLC, EARLE ASPHALT
COMPANY, and JEFFREY L.
EVANS,

      Defendants-Appellants.

_____

Argued September 10, 2024 – Decided October 2, 2024

Before Judges Gilson and Augostini.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2517-22.

Anthony J. Fredella argued the cause for appellants (Trif & Modugno, LLC, attorneys; Scott M. Palatucci and Anthony J. Fredella, on the briefs).

Justin Lee Klein argued the cause for respondent Carol Morris Stahlberg (Hobbie & DeCarlo, PC, attorneys; Jacqueline DeCarlo, of counsel and on the brief).

Michael R. Napolitano argued the cause for respondent Estate of Bertram J. Stahlberg (Fuggi Law Firm, PC, attorneys; Robert R. Fuggi, Jr., of counsel; Michael R. Napolitano, on the brief).

PER CURIAM

On leave granted, defendants Walter R. Earle Transit, LLC, Earle Asphalt Company (collectively, the Earle defendants), and Jeffrey L. Evans (Evans) appeal from a February 28, 2024 order disqualifying the law firm of Ahmuty Demers & McManus (ADM) from representing the Earle defendants and Evans in this action, which involves negligence claims against the defendants related to a motor vehicle accident. Because the trial court correctly found that there were concurrent conflicts, as well as significant risks of conflicts, between the positions of the Earle defendants and Evans, we affirm.

I.

This appeal arises out of a fatal motor vehicle accident that occurred on July 20, 2022, on the Garden State Parkway. The accident involved a truck driven by Evans and owned by the Earle defendants and a car driven by Bertram Stahlberg. Carol Morris Stahlberg, who was Bertram's wife, was a passenger in the car.

2

A-2373-23

At the time of the accident, the Earle defendants were performing paving work on the Garden State Parkway under a contract with the Garden State Parkway and the New Jersey Turnpike Authority. Evans was working as a driver for the Earle defendants.

At approximately 11:00 p.m. on July 20, 2022, Evans made a U-turn by driving through a paved emergency-response cut-through at mile post 87.5 on the Garden State Parkway. After making the U-turn, Evans pulled onto the southbound Garden State Parkway, which was open to southbound traffic. Bertram Stahlberg and Carol Morris Stahlberg were traveling southbound at that time and their car struck the Mack truck being driven by Evans. As a result of that crash, Bertram was killed, and Carol was severely injured.

Shortly after the accident, the Earle defendants investigated the accident and prepared an "incident description" report of the crash. In that report, the Earle defendants stated that Evans "wrongfully used [a] police [c]ut[-]through at [the mile] 87.5 median." The report then stated:

> [The Earle defendants] had [set up] a grass median turnaround spot at [mile] 86.75 which was safely contained between both the northbound and southbound closures. This [kept] operators and drivers within close[d] lanes while spinning around. Under no circumstances [were] police cut[-]throughs to be used unless there [were] lane closures northbound and southbound for trucks to safely . . . [pull] out of them.

> [By] [Evans'] truck using the [c]ut[-]through, he pulled out into [l]ive traffic unprotected where an elderly couple drove at 65 miles an hour or greater into the rear right of the . . . truck. [The car] was totaled [and the] driver was [medevacked] and helicoptered out of [the] location.

Thereafter, Evans was served with three motor vehicle summonses, which charged him with making an illegal U-turn, careless driving, and reckless driving. In June 2023, Evans pled guilty to making an illegal U-turn and the other two charges were dismissed.

In September 2022, Carol Morris Stahlberg, representing herself individually and acting as the executrix of the estate of her deceased husband, sued the Earle defendants and Evans. Plaintiffs asserted direct negligence claims against Evans, alleging that he caused the motor vehicle accident. Plaintiffs also asserted direct negligence claims against the Earle defendants, contending that they were vicariously liable for Evans' negligence, and they had also been negligent in hiring, supervising, and training Evans.

During discovery, Evans and Michael Morrow, who was a foreman for the Earle defendants and Evans' supervisor on the Garden State Parkway paving project, were both deposed. Evans was deposed on August 1, 2023. At his deposition, Evans explained that after the accident, he became aware of a

"miscommunication" regarding which cut-through he was supposed to have used. In that regard, Evans testified, in part, as follows:

> Q. Why did you use the emergency vehicle turnaround at [mile] 87.5?
>
> A. Because I was instructed to use the turnaround by the foreman on the job. It was a miscommunication, I thought that that was the one I was supposed to use [but] there was one further back over the grass that he was talking about.
>
> Q. Who was this person that instructed you?
>
> A. Michael [Morrow].[1]
>
> Q. Michael [Morrow] told you to use a turnaround, but you made a mistake[,] and you used the emergency vehicle turnaround at [mile] 87.5 instead of the grass covered turnaround[,] which is closer to [miles] 84 and 85, yes?
>
> . . .
>
> A. Yes.

Thereafter, on December 19, 2023, Evans' supervisor Michael Morrow was deposed. Morrow testified that he called all the truck drivers working on July 20, 2020, including Evans, and instructed them over the radio that they were to use a grass cut-through marked by cones. In that regard, Morrow testified:

> Q. What did you say regarding the cut-through?

_____

[1] In the deposition transcript, Morrow is incorrectly spelled as "Mauro."

A. I said . . . there [are] two cones in the grass area where the grass is tor[n] up to use in between those two cones, go through the southbound lane closure and ride that closed lane all the way out . . . .

. . .

Q. You specifically recall that you used the word grass?

A. Yes.

Q. . . . [a]nd you specifically said grass covered cut-through, yes?

A. Yes.

Q. And you said that four different times or three or four different times?

A. To my knowledge, yes.

Morrow went on to testify that he first learned of the crash involving Evans' truck "[r]ight after the accident[,]" when Evans called Morrow from Evans' personal cell phone. Specifically, Morrow testified:

Q. Did [Evans] tell you . . . the location of the police cut-through that he took, the emergency police cut-through?

A. Not until after I asked him where it was.

Q. When you asked him where it was[,] what did he say?

6

A.    He said, I missed the cut-through and I took that cut-through.

Q.    . . . So[,] . . . Evans admitted to you that he missed the first cut-through, the one that he was authorized to take, and then he took the police emergency one, correct?

A.    To my knowledge.

. . .

Q.    So[,] [Evans] admitted it was an illegal cut-through that he took, yes?

A.    I would imagine, yes.  He said it was not the cut-through I told him to cut-through.

Q.    So[, Evans] disobeyed one of your instructions? Instead of going through the grassy cut-through, which was closer to your work area, he went and took the emergency cut-through, which was paved macadam up the road?

A.    To my recollection, yeah.

Q.    So[, Evans] disobeyed the instructions you gave him?

A.    Yes.

Following Evans' deposition, counsel for plaintiffs wrote to ADM and took the position that ADM's joint representation of the Earle defendants and Evans was a concurrent conflict of interest that may require ADM's disqualification as counsel in this matter.  Plaintiffs' counsel requested ADM to

7

produce copies of any waivers that it had obtained from the three defendants. ADM responded by rejecting plaintiffs' position concerning a conflict and did not produce any written waivers of the conflict from their three clients.

In December 2023, following the deposition of Morrow, plaintiffs moved to disqualify ADM, contending that their representation of the Earle defendants and Evans involved conflicts of interest under RPC 1.7. On February 16, 2024, the trial court heard argument on that motion and, that same day, granted the motion and explained the reasons for the ruling on the record. Shortly thereafter, on February 28, 2024, the court entered an order disqualifying ADM from representing defendants in this matter and directed that defendants "shall be represented by separate counsel[.]"

In making that ruling, the trial court found that there was a concurrent conflict of interest between the Earle defendants and Evans. In that regard, the trial court reasoned that the representation of Evans "relies on the theory that he was told to make the illegal cut[-]through and did not do so on his own [accord]." In contrast, the trial court found that the Earle defendants "rely on the notion that the supervisor explicitly instructed the drivers to refrain from the cut[-]through[]. Those theories are directly adverse to each other under the rules and a conflict has arisen."

The trial court went on to reason that even if a concurrent conflict did not exist, there was a significant risk of a conflict arising between the positions of the Earle defendants and Evans. The court found that if one lawyer or one law firm represented all defendants, the representation to Evans or the Earl defendants would be limited because of the difference in theories of why Evans took the cut-through he used. The court recognized that there was no dispute that an employer/employee relationship existed between the Earle defendants and Evans, but reasoned that that relationship did not permit one counsel to represent all defendants when there was a significant risk of a conflict between Evans and the Earle defendants.

The trial court also pointed out that no written waivers of consent were produced by ADM. Consequently, the court found that defendants' statements that they wished to retain the same law firm was not enough to offset the current conflict or minimize the significant risk of conflicts arising in the future.

Defendants thereafter retained a new law firm and moved for leave to appeal the February 28, 2024 order. We granted that motion.

II.

On appeal, the Earle defendants and Evans, represented by the same attorneys, argue that there is no concurrent conflict of interest between their

A-2373-23

positions. They also contend that there is no significant risk of conflicts developing. In that regard, defendants assert that Evans and Morrow "had a miscommunication about which cut-through" to use, but "neither has blamed the other for the miscommunication or, more importantly, for the happening of the accident." We reject those arguments because they are inconsistent with the facts in the record and RPC 1.7.

When deciding a motion to disqualify counsel, courts must "balance competing interests, weighing the need to maintain the highest standards of the profession against a client's right freely to choose his [or her] counsel." Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 273-74 (2012). "[T]o strike that balance fairly, courts are required to recognize and to consider that 'a person's right to retain counsel of his or her choice is limited in that there is no right to demand to be represented by an attorney disqualified because of an ethical requirement.'" Id. at 274 (quoting Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988)). Motions for disqualification should be "viewed skeptically in light of their potential abuse to secure tactical advantage." Escobar v. Mazie, 460 N.J. Super. 520, 526 (App. Div. 2019). Nevertheless, "[i]f there [is] any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification." Twenty-First

10

Century Rail Corp. v. N.J. Transit Corp., 419 N.J. Super. 343, 358 (App. Div. 2011) (quoting Herbert v. Haytaian, 292 N.J. Super. 426, 438-39 (App. Div. 1996) (alternation in original)).

"[A] determination of whether counsel should be disqualified is, as an issue of law, subject to de novo plenary appellate review." City of Atlantic City v. Trupos, 201 N.J. 447, 463 (2010). The burden is on movants to prove a basis for disqualification. State v. Hudson, 443 N.J. Super. 276, 282 (App. Div. 2015).

Under RPC 1.7, a lawyer or a law firm is prohibited from representing a client, or more than one client, if there is a concurrent conflict of interest. In that regard, RPC 1.7(a) states:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client, or a third person or a personal interest of the lawyer.

RPC 1.7(b) goes on to state that in certain circumstances, clients may waive concurrent conflicts provided all clients give written "informed consent." That part of the rule reads:

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> (1)    each affected client gives informed consent, confirmed in writing, after full disclosure and consultation, provided, however, that a public entity cannot consent to such a representation. When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;
>
> (2)    the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (3)    the representation is not prohibited by law; and
>
> (4)    the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

RPC 1.7 embodies "the fundamental understanding that an attorney will give 'complete and undivided loyalty to the client' [and] 'should be able to advise

the client in such a way as to protect the client's interest.'" State ex rel. S.G., 175 N.J. 132, 139 (2003) (quoting In re Dolan, 76 N.J. 1, 9 (1978)). Consequently, when a conflict develops, an attorney must withdraw from the representation of both parties. See McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 497 (App. Div. 2011) (explaining that "when [jointly represented parties'] interests become adverse, counsel is required to completely withdraw from the representation of each client"). See also DeBolt v. Parker, 234 N.J. Super. 471, 484 (Law Div. 1998) (holding that "[w]hen an attorney represents potentially and foreseeably adverse interests, . . . and the adversity becomes actual, counsel must withdraw from any representation of both parties").

Consistent with the mandates of RPC 1.7, we have explained that "joint representation of multiple parties whose interests are potentially diverse is permissible only if 'there is a substantial identity of interests between them in terms of defending the claims that have been brought against all defendants.'" Hill v. New Jersey Dep't of Corr., 342 N.J. Super. 273, 309 (App. Div. 2001). Accordingly, we have held that a conflict of interest existed when one firm sought to represent three defendants whose interest in attributing fault to each other were in conflict. Wolpaw v. Gen. Accident Ins. Co., 272 N.J. Super. 41, 45 (App. Div. 1994). In Wolpaw, an insurance company assigned "a single [law]

13

firm" to represent the homeowner, the homeowner's sister, and the sister's eleven-year-old son, who had accidentally shot a playmate with an air rifle. Id. at 43-44. We held that the three defendants were entitled to separate counsel because the "three insureds had the common interest of minimizing the amount of [an injured neighbor's] judgment and maximizing the percentage of fault attributable to the other defendants. However, their interest in maximizing the percentage of the other insurers' fault and minimizing their own were clearly in conflict." Id. at 45.

In this matter, Evans and the Earle defendants have a similar concurrent conflict of interest as the three defendants in Wolpaw. The Earle defendants and Evans have an interest in denying liability for the accident, as well as limiting any judgment against them. They are, therefore, in conflict as to who was at fault for the accident. Given his testimony, Evans has a clear interest in arguing that he followed the instructions of his employer when he used the paved emergency cut-through. In direct contrast, the Earle defendants will argue that Evans failed to follow instructions by using the wrong cut-through and that failure directly led to the accident. Even if the Earle defendants will ultimately be responsible for any judgment against Evans, they have a business interest in contending that Evans did not follow the safety instructions. The Earle

defendants may want to do additional work for the Garden State Parkway and the New Jersey Turnpike Authority. It is, therefore, important for them to maintain that they have good safety procedures, and that they instruct employees on how to follow those procedures.

The concurrent conflict also arises out of the claims brought by plaintiffs. The plaintiffs have asserted direct negligence claims against both the Earle defendants and Evans. Consequently, a jury will have to determine if just Evans was negligent, or if Evans and the Earle defendants were negligent. In either of those scenarios, a lawyer representing Evans and the Earle defendants will have to make strategic determinations on how to present a defense and that will involve conflicts between the Earle defendants and Evans. Moreover, if all defendants are found to be negligent, the jury will have to apportion the percentage of negligence and, there again, the interest of defendants will be in conflict.

There is also a substantial risk of conflicts developing. Evans is entitled to independent counsel who will focus on his interests. His interests in defending against the negligence claims may differ from the Earle defendants. In that regard, he may not want to characterize his communications with Morrow as a "miscommunication." Instead, it may be in his interest to maintain that he

15

heard only the instruction to use a cut-through and that he then used a paved cut-through that he thought to be the most appropriate, available cut-through. Therefore, the differences in testimony between Evans and Morrow poses a substantial risk of creating conflicts between the position of Evans and the Earle defendants.

In summary, we discern no error in the trial court's decision to disqualify ADM from representing all the defendants in this litigation. Moreover, because ADM had not obtained written consents from all the defendants, they are now required to withdraw from representing any defendant. We, therefore, affirm the February 28, 2024 order.

Affirmed. The matter is remanded to the trial court, and we do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16