852 A.2d 246 (2004)
371 N.J. Super. 151
STATE of New Jersey, Plaintiff-Respondent,
v.
Michael LASANE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 27, 2004.
Decided July 13, 2004.
*247 Yvonne Smith Segars, Public Defender, attorney for appellant (Arthur J. Owens, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Janet Flanagan, Deputy Attorney General, of counsel and on the brief).
Before Judges STERN, LEFELT and PAYNE.
The opinion of the court was delivered by STERN, P.J.A.D.
After we remanded for an evidentiary hearing on defendant's petition for post-conviction relief ("PCR"), the PCR judge concluded that while defendant's mother and his attorney were involved in a "sexual liaison" during the course of defendant's representation by his designated public defender, it did not occur until after his guilty plea was entered. Consequently, the judge denied relief.
Defendant claims that "the post-conviction relief court erred in finding that [he] failed to demonstrate that he was denied the effective assistance of trial counsel." The claim is premised on the assertion that "trial counsel engaged in an affair with defendant's mother," that "[o]ver the course of the relationship, counsel pressured defendant's mother to coerce defendant into accepting the plea" and that when defendant sought to withdraw his *248 guilty plea prior to sentencing, his mother stated that "if he did so, neither she nor her family would continue to support him." Defendant seeks to have his "conviction vacated and a new trial ordered."
The State contends that "the record overwhelmingly supports the conclusions of the post-conviction relief court and its findings that defendant failed to establish either that trial counsel was ineffective or that he was prejudiced thereby." In so contending, the State emphasizes that "the sexual encounter could not have influenced defendant's decision to plead guilty, as it did not happen until after defendant had [pled] guilty." The State further argues that "[o]ur standards of review dictate that this court give appropriate deference to the post-conviction court's credibility determinations" and "[a]s defendant established no potential or actual conflict, this court need not consider whether defendant was adversely affected or [if] there was a `substantial likelihood of prejudice.'"
We reverse the denial of post-conviction relief and remand to permit defendant to withdraw his guilty plea and proceed to trial. The strength of the State's case, including the fact that defendant's voice was identified on a tape recording the victim made during the course of the events resulting in the victim's death, may affect the decision to withdraw the guilty plea, but it does not affect the fact that the conduct of defense counsel warrants the relief we order.

I.
The homicide occurred on March 14, 1996. Defendant turned seventeen years old the day after the offenses for which he was charged. Probable cause was established at a hearing held on March 21, 1996. Thereafter, on January 14, 1997, defendant consented to waiver of the matter to the Law Division for disposition as an adult. He was represented by the same attorney, designated by the Public Defender, from the initiation of proceedings through sentencing.
On January 23, 1997, defendant pled guilty to an accusation charging him with felony murder, N.J.S.A. 2C:11-3a(3), in exchange for dismissal of a complaint also charging him with theft, purposeful and knowing murder, armed robbery, and carjacking. At the time of his plea, defendant acknowledged that he was exposed to the maximum sentence permitted for felony murderlife imprisonment with the required thirty years to be served before parole eligibility. The State indicated that it would request imposition of a "life sentence with 30 years to be served before eligib[ility] for parole[the] `maximum sentence provided by law.'"
In his factual basis, defendant stated that while at the Caldor Shopping Mall on Route 37 in Toms River at approximately 3:00 p.m. on March 14, 1996, he "decided to steal a car," "got in the car ... told the woman [therein to] give [him] the keys." After she gave him the keys, defendant "drove a substantial distance from the parking lot" to a "wooded area in Manitou Park." The victim remained "confined" in the car while defendant "thought about what to do to get away with the car." He ultimately "put duct tape on her hands and ankles and ... left with the car" after she promised that she would not scream. However, as he was leaving, defendant heard the victim scream and "came back and ... put [his] hand over her face [to] stop her from screaming." As he held her mouth, the victim stopped "moving" and stopped "breathing," and defendant realized that she was dead. He indicated that he did not "intend to kill" the victim, and further acknowledged that he led the victim to believe, in response to her questions while in the car, that he had a gun.
*249 In response to the prosecutor's questions directed to the factual basis, defendant acknowledged that his voice was recorded on a tape that the victim made during the course of the transaction and that the tape indicated that he had threatened to use a gun. While defendant stated that he did not know how certain marks got on the victim's face, he admitted that he left the woman knowing that she was dead and used her car until he was arrested several days later. Defendant also acknowledged that "whether [he] meant to or not, [he] smothered [the victim] to death."
Defendant was sentenced to life imprisonment with thirty years to be served before parole eligibility and ordered to pay a $5,000 V.C.C.B. penalty and a $75 Safe Neighborhood Fund assessment.
We affirmed the conviction and sentence on defendant's direct appeal in which he claimed that the sentence was manifestly excessive.
On June 15, 1999, defendant filed a PCR petition based on a claim of ineffective assistance of counsel. The petition was denied. We noted defendant's claim on his subsequent appeal:
In defendant's brief in support of his petition, defendant, a juvenile at the time of the offense, claims that his guilty plea to murder "was a product of coercion and ineffective assistance of counsel due to an actual conflict of interest." He specifically asserted that his assigned counsel "[u]ndertook a course of action to engage in an intimate affair with the petitioner['s] mother ..." and that "defense counsel used his mother to coerce him in the direction defense counsel wanted to proceed." He further asserted that, together with defense counsel, his mother "advised him to waive jurisdiction[ ]" from the Family Part and "to waive his right to indictment and trial by jury." He added:
On or around early January 1997, petitioner['s] mother visited him in the Ocean County Jail and told him to accept the plea offered by defense counsel or the family would withdraw all support for him.
....
Defense counsel and petitioner['s] mother worked closely together to represent him. However, from fear that his wife would learn of the affair, defense counsel convinced petitioners' [sic] mother to coerce him into accepting the plea deal, which the petitioner did not want to accept. Moreover, the swift dispensing of this case afforded defense counsel the opportunity to brake-off [sic] the relationship with the petitioners' [sic] mother before it could be discovered by counsels' [sic] wife. And since the guilty plea was a product of coercion and a conflict of interest, the petitioner was denied due process of law and the effective assistance of counsel.
Before us, defendant assert[ed] that he was entitled to an evidentiary hearing in order to develop the nature of the relationship and its impact on defendant's actual desires with respect to entry of his negotiated guilty plea.
Appended to the brief in support of defendant's [PCR] petition ... was a statement of defendant's mother sworn to before, or taken by, a notary public. That statement included the following:
On approximately fall of 1996[sic], during which my son was incarcerated due to numerous charges among which was homicide, I engaged in an intimate affair with my son[']s court appointed attorney....
I did not wish for my son to plead guilty to any of the charges brought *250 against him, because he explicitly proclaimed his innocence and I believe in his innocence, but after the affair with [counsel], I began to have very intimate feelings for him and subsequently allowed him to convince me to coerce my son into accepting a plea bargain. He instructed me to use any means necessary to make Michael accept the plea, and said that if Michael did not accept the offer, he would decline for representing my son at trial, and with any other attorney my son would surely lose.
Prior to sentencing Michael informed me that, although he had already formerly plead [sic] guilty, he wished to attempt to withdraw his plea and seek new representation.
Consequently, due to the influence gained by the inappropriate relationship between my son['s] attorney and myself[,] I responded to Michael by saying that if he did expel [counsel's] services [neither] I nor his family would continue to support him. There were several other instances upon which [counsel], other family members[ ] and myself used coercive suggestions in order to get Michael to plead guilty.
Michael had no prior knowledge of the above stated situation.
Other family [members] were instructed to discourage Michael from pursuing a trial by jury. [Counsel] met with several family members, produced several items of evidence and claimed Michael had confessed the crime to him "but was confused and afraid to[] tell[.]" []He asked those present to use the[ir] influence to convince Michael to accept the said plea bargain. I later [asked] Michael if he confessed any such thing to [counsel] and he said no.
In our opinion of October 22, 2001, we remanded for an evidentiary hearing, stating among other things that:
Nothing in this record reflects that defendant was given improper advice by counsel or that there was any misunderstanding regarding what defendant was told by counsel, or an inadequate plea colloquy by the court. These factors are usually the prerequisite to withdraw a guilty plea, see, e.g., State v. Simon, 161 N.J. 416, 442-44, 737 A.2d 1 (1999); State v. Garcia, 320 N.J.Super. 332, 339-40, 727 A.2d 97 (App.Div.1999); State v. Phillips, 133 N.J.Super. 515, 520, 337 A.2d 627 (App.Div.1975). Here, defendant asserts that his attorney had divided loyalties in that he had a personal motive to coerce defendant into making the admissions and acknowledgments defendant voiced on the record at the time of plea.
If defendant was so coerced by his attorney and his mother because of the attorney's personal interests, the guilty plea would not be voluntary, as required by both the state and federal constitutions, e.g., State ex rel T.M., 166 N.J. 319, 335-36, 765 A.2d 735 (2001), and R. 3:9-2. In any event, particularly because defendant was a juvenile, the allegations in the petition for post-conviction relief and the verified statement of defendant's mother give rise to the need for an evidentiary hearing as to whether there is a reasonable probability that defendant was improperly, although unknowingly, coerced into entering a guilty plea to felony murder, and that but for the misconduct of his counsel, defendant would not have entered a guilty plea. See Hill v. Lockhart, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203, 210 (1985). See also State v. Cummings, 321 N.J.Super. 154, 169, 728 A.2d 307 *251 (App.Div.1999) [certif. denied, 162 N.J. 199, 743 A.2d 852 (1999).]
Defendant would be entitled to post-conviction relief only if, after an evidentiary hearing, the trial judge concludes that, but for counsel's conduct, defendant "would not have pleaded guilty" or would not have done so on the terms that he did at the time. Hill v. Lockhart, supra, 474 U.S. at 59, 106 S.Ct. at 370. Of course, the strength of the State's case against defendant must be considered in evaluating the reasons for counsel's advice, as well as the credibility of defendant's statement that he would not have pled guilty.[1]
In light of our disposition, we accept the recitation in the State's brief of the relevant testimony at the subsequent PCR hearing:
[Counsel] testified that at some point prior to the waiver proceeding, the prosecutor, William Cunningham, approached [counsel] about a plea offer. [Counsel] testified that in his professional opinion, he felt it in defendant's best interest to accept the plea bargain agreement and so advised defendant and his mother. At the evidentiary hearing, [counsel] explained the bas[i]s of his opinion: "My position that he should take the deal was based on my assessment of the case, my experience, the strength of their case against him, and that was not going to change ....[i]t didn't change then ....[i]t doesn't change now ....[i]we'll never change." He emphasized that his opinion was based solely on the strength of the State's case against defendant: "All of it was based on the strength of the State's case ....[t]he case was overwhelming[ly] against him."
At the hearing, [counsel] made clear that he never pressured defendant's mother or defendant to plead guilty. In fact, [counsel] noted that he "could care less whether he took the deal." [Counsel] also pointed out that there was never any discussion with defendant about the death penalty because he was well aware that "people [defendant's] age are not subjected to the death penalty."
[Counsel] testified that defendant himself made the decision to accept the plea bargain agreement. [Counsel] pointed out that the juvenile waiver proceeding took place on January 14, 1997, but the guilty plea proceeding did not occur until January 23, 1997. [Counsel] explained that, despite the urging of the prosecutor that the guilty plea commence immediately after the waiver proceeding, he "didn't want the case to move that quickly ....[he] wanted to give [defendant] an opportunity to first go through the ordeal of his being waived up and [they] still needed to discussand [he] still wanted to make sure that [he] went over with [defendant] the offer for the adultwhat was being offered to [him] by the Prosecutor's Office and make sure that [defendant] understood it." [Counsel] also noted that after the waiver proceeding but before the guilty plea, with the consent of defendant's mother and at the request of a family member, he met with some of defendant's extended family members because they had some questions about the case and were interested in privately retaining him.

*252 At the evidentiary hearing, [counsel] admitted having a one-time sexual encounter with defendant's mother, Vera Thomas. [Counsel] was "absolutely positive" that it occurred the "end of January, early February" 1997, after defendant had already pled guilty. [He] testified that the encounter, which occurred after defendant had already pled guilty, had nothing to do with his advice to defendant to plead guilty. At that point, the case was "basically over" except for sentencing. He noted that the day after the one-time encounter, Thomas telephoned him and requested that he put the encounter "out of [his] mind and forget that it ever happened and she wanted [him] to continue to represent her son." [Counsel] emphasized that what happened on that one occasion between him and Thomas had "absolutely nothing to do with [defendant]." He acknowledged that he did not tell defendant about the one-time encounter. [Counsel] testified that he never used the one-time sexual encounter to pressure defendant's mother to convince defendant to "do anything."
Counsel also testified that the event occurred while he "was preparing for Michael's sentencing," when "Vera had earlier called me to request that I file a motion to withdraw Michael's guilty plea because she felt that he was not guilty." Counsel went over to the defendant's mother's house where his mother explained her view that Michael's brother committed the crime and then began to kiss him and disrobe. He testified that the sexual act occurred because, after considering the alternative, he was concerned about leaving her in her depressed condition and was convinced "that she was going to take her life" if he did not.
Defendant's mother also testified at the PCR hearing. As the State's brief recites it:
She admitted that the sexual encounter with [counsel] was a one-time occurrence, but she claimed it happened in July 1996, "right after [she] got out of rehab." She claimed that she "got out of rehab" on July 4th. She noted that she was in rehabilitation for an alcohol problem and a nervous breakdown related to her son's situation in the case. She indicated that at the time of the sexual encounter that she was "pretty lit up," meaning intoxicated. Thomas refused to acknowledge that her written statement in support of the post-conviction application had insinuated a continuing sexual relationship ("intimate affair" in the "Fall of 1996"), when in fact it was a one-time encounter, which she claimed at the hearing occurred in July 1996. She did acknowledge that they did not have a romantic relationship.
According to Thomas, [counsel] asked her to "try to get [defendant] to admit that he was guilty." She claimed that after the one-time sexual encounter, [counsel] started "pushing [her] harder to make [defendant] say he was guilty." She claimed that she did not want defendant to plead guilty. She also denied that [counsel] went over the evidence with her. According to her testimony, defendant only pled guilty because she asked him to plead guilty. Yet, she acknowledged that at the time defendant was "grown ... [and] knows what he wants to do, he always did know what he wanted to do."
Thomas testified that the Ocean County Prosecutor himself had offered defendant a plea bargain on the night of defendant's arrest in March 1996. She admitted that [counsel] explained to her the consequences of going to trial. However, she denied knowing anything about the waiver proceeding, despite the *253 fact that she was in court with defendant that day. She also testified that [counsel] told her that he would not take the case to trial because he "couldn't win it." She claimed that he never explained why he could not win it. She claimed that after defendant was sentenced, [counsel] would not take her phone calls.
In rendering his opinion, the trial judge gave very specific reasons for finding that defendant's mother lacked credibility. The judge detailed the differences in her affidavit and testimony, the fact that she had specific recollection at certain times but not at others, and the differences between her pre-hearing reference to a relationship and the subsequent testimony concerning the single event and the timing of it.
The judge found defense counsel to be credible, particularly given the potential personal and professional consequences of his admission. The judge concluded:
I find [a]s a fact that there was [a] sexual liaison between these people. I find as a fact that it happened at a time in January, late January, early February, between the date this plea was entered and before the sentencing, not in July, not in the fall of 1996 as Ms. Thomas would have us believe, and that it was a one night circumstance or a one time event.
I find[ ] his testimony credible that it was Ms. Thomas [who] the next day called and said, "Please forget about it. It was inappropriate and please continue to represent my son."
She must have had some knowledge because of her work within the Court system before she became disabled that this encounter may, in fact, leave [counsel], who is a highly professional attorney, to say, "I can't represent your son any longer."
So she called immediately the next day to contact him to say, "Let's forget about it. Let's act as if it didn't happen. It was inappropriate. It shouldn't have happened. I apologize for my actions. Please continue to represent my son." I believe that happened.
Then there came a time and he acknowledges that Michael Lasane indicated he wanted to retract his guilty plea. He said he wouldn't do it. Why wouldn't he do it? Because there's no basis in law or fact for the retraction of the guilty plea. It would be a frivolous motion.
After detailing the strength of the State's case, which had been the subject of testimony at the hearing, and the professional efforts of counsel, the PCR judge continued:
I find the following to be true. [Counsel] and Vera Thomas had sex with each other sometime in late January or early February of 1997. I find as a fact that it was one encounter. I find as a fact that it had no bearing whatsoever at any point on [counsel's] advice to his client. At no time did [counsel], I find as a fact, use that intimate relationship with Vera Thomas to get an upper hand or any added pressure on Michael Lasane to get him to do anything.
The testimony was that Mr. Lasane always knew what he wanted to do and did what he wanted to do.
Her testimony was that her son turned to her and said, "Mommy, I'll do whatever you say."
He may have said those words. I have some question in my mind whether he said those words in that manner, but he may have said, "I'll do what you say," or, "I'll agree with that position." But that was not as a result of any relationship or any extra pressure brought to *254 bear upon him by Vera Thomas because of her relationship with [counsel].
It was because she was pleading with her son to save an extra 15 years minimum off his sentence. She was looking at her 17 year old son and saying, "In 30 years I might still be here and you'll be out of prison and I'll see you." But it's a clear recognition of a mother saying, "If you add another 15 years on top of that, you may live to get out of prison, Michael, but I won't live to see you get out of prison."
So if there was any pressure brought to bear by Vera Thomas on Michael Lasane to plead guilty, that was the motivation, because there is no one here that has submitted a scintilla of evidence, not a speck, that this wasn't a great deal.
....
I'll take it one step further and I'll make this finding. There was no conflict after the plea and before the sentencing. The incidental sexual event between [counsel] and Ms. Thomas had no impact, no influence, no pressure, and had nothing to do with this case in any way. I don't know what caused it to become an issue. Perhaps Mr. Lasane once he started to serve his 30 years without parole got the advice of some jailhouse lawyers and determined that this conflict could get you to not [plead] not guilty. That's not so.
Accordingly, post-conviction relief was denied.

II.
We start our analysis by noting that we will apply the Rules of Professional Conduct ("RPC") and principles of professional responsibility in effect at the time of the conduct involved, Comparato v. Schait, 180 N.J. 90, 96, 848 A.2d 770 (2004), even though we find that recent amendments present no critical or relevant change affecting the issue before us. However, the "appearance of impropriety" principle was expressly in effect at that time. See State v. Davis, 366 N.J.Super. 30, 42-44, 840 A.2d 279 (App.Div.2004).
"One of the most basic responsibilities incumbent on a lawyer is the duty of loyalty to his or her clients." In re Opinion No. 653 of the Advisory Committee on Professional Ethics, 132 N.J. 124, 129, 623 A.2d 241 (1993). "The attorney-client relationship is grounded in the fundamental understanding that an attorney will give `complete and undivided loyalty to the client' so that `... [t]he attorney should be able to advise the client in such a way as to protect the client's interests, utilizing his [or her] professional training, ability and judgment to the utmost.'" State ex rel. S.G., 175 N.J. 132, 139, 814 A.2d 612 (2003) (quoting In re Dolan, 76 N.J. 1, 9, 384 A.2d 1076 (1978)). "In criminal matters, in which the trust between attorney and client has enhanced importance, special vigilance is required because an attorney's divided loyalty can undermine a defendant's Sixth Amendment right to effective assistance of counsel." Ibid. Thus, an attorney should not represent a client if there is a significant risk that the representation will be materially affected by some duty of loyalty or responsibility to himself or to a third person. RPC 1.7(a)(2) (effective January 1, 2004). See also RPC 1.7(a)(2), (b) (in effect at the time of the plea and sentencing in this case).
We recognize that the Supreme Court recently rejected a proposal of its Commission on the Rules of Professional Conduct ("Commission") to create RPC 1.8(j), "which would have explicitly prohibited sexual relations between a lawyer and client unless a consensual relationship existed *255 prior to the creation of the lawyer-client relationship." Supreme Court of New Jersey Administrative Determinations in Response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct, September 10, 2003, RPC 1.8 at 25. See also Restatement (Third) of the Law Governing Lawyers § 16 cmt. c (2000). The Supreme Court, however, concurred with the New Jersey State Bar Association's objection that the proposed rule "was too broadly worded and that inappropriate sexual contact can be dealt with by other existing RPCs such as 8.4." Ibid. We also recognize that this case does not involve a sexual relationship with a client, see, e.g., In re Liebowitz, 104 N.J. 175, 180-81, 516 A.2d 246 (1985), and that some clients retain counsel because of their relationship, even sexual relationship, or the relationship of a family member or friend, with an attorney. However, there is no dispute that defense counsel in this case was assigned by the Public Defender and had no prior relationship with defendant or his family.
Although it is not disputed that defense counsel did, in fact, have a sexual relationship with defendant's mother, the judge found that it occurred after the defendant's guilty plea, which the State argues is factually significant. And, while we have reservations about the credibility of defense counsel because of the personal and ethical consequences of his actions, the PCR judge recognized that fact, and we are constrained by the trial judge's determination of credibility. See, e.g., State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964).
In any event, the relationship occurred before defendant was sentenced and at a time when the trial judge had to view a motion to withdraw the plea with some liberality. R. 3:21-1; State v. Taylor, 80 N.J. 353, 363-66, 403 A.2d 889 (1979); State v. Luckey, 366 N.J.Super. 79, 86-88, 840 A.2d 862 (App.Div.2004). A defendant can challenge the voluntary, knowing, intelligent nature of his plea by showing that the advice he received from counsel was not within the standards governing a reasonably competent attorney. Hill v. Lockhart, 474 U.S. 52, 56-57, 106 S.Ct. 366, 369, 88 L.Ed.2d 203, 208-09 (1985). Moreover, it is undisputed that defendant's mother counseled her young son to plead guilty and maintained that position until the PCR petition was filed. Furthermore, it is not suggested that the attorney and mother engaged in sexual intercourse on their first encounter, without having developed some relationship before the plea was entered.
RPC 8.4 governs attorney misconduct, and prohibits "conduct that is prejudicial to the administration of justice." RPC 8.4(d). RPC 8.4(c) further provides that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." In this case, defense counsel failed to advise his client of his sexual relationship with defendant's mother while she was supplying his family support and encouraging a quick disposition of the charges. It is clear that, irrespective of whether the sexual relationship occurred before or after the guilty plea, it occurred before the matter was concluded, and "[e]ven if an attorney lacks bad intentions, he should not become involved in a situation where his personal interests conflict with those of his client." Matter of Nichols, 95 N.J. 126, 131, 469 A.2d 494 (1984). After the sexual encounter, defense counsel had a professional interest in terminating his relationship with defendant and his family as soon as possible.
*256 As already noted, in criminal matters "the trust between attorney and client has enhanced importance [and] special vigilance is required because an attorney's divided loyalty can undermine a defendant's Sixth Amendment right to effective assistance of counsel." S.G., supra, 175 N.J. at 139, 814 A.2d 612. It is "incumbent on the courts to ensure that defendants receive conflict-free representation," id. at 140, 814 A.2d 612 (citing State v. Loyal, 164 N.J. 418, 433, 753 A.2d 1073 (2000)), and "[a] defense attorney's representation must be `untrammeled and unimpaired,' his loyalty undivided." State v. Bellucci, 81 N.J. 531, 538, 410 A.2d 666 (1980). Furthermore, "[t]he Rules of Professional Conduct are designed to assure that, in representing a client, counsel's judgment is not impaired by divided loyalties or other entangling interests" and "to further a broader societal interestthe integrity of the trial process itself." State v. Jimenez, 175 N.J. 475, 484-85, 815 A.2d 976 (2003). See also United States v. Dolan, 570 F.2d 1177, 1184 (3rd Cir.1978).
"The constitutional right to the `assistance of counsel' contemplates that the attorney's position as an advocate for his client should not be compromised before, during or after trial." State v. Land, 73 N.J. 24, 29, 372 A.2d 297 (1977). In State v. Bellucci, our Supreme Court stressed that "[t]here is no greater impairment of a defendant's constitutional right to counsel than that which can occur when his attorney is serving conflicting interests," and "[t]he constitutional effectiveness of counsel therefore depends on [counsel's] adherence to those ethical standards which serve to maintain his [or her] independent professional judgment." Bellucci, supra, 81 N.J. at 538, 410 A.2d 666. See also State v. Norman, 151 N.J. 5, 25, 697 A.2d 511 (1997). While this case does not concern representation of multiple clients, the fundamental principle remains the same.
We can find no analogous cases in New Jersey involving a sexual relationship between defense counsel and his or her client's close relative during the course of representation. But we draw strength from cases of other jurisdictions. In a recent attorney disciplinary case in South Carolina, an attorney was publicly reprimanded by the Supreme Court of South Carolina for, among other violations, having a sexual relationship with a client's mother and failing to disclose the relationship to the client prior to trial. See In re Brown, 356 S.C. 10, 587 S.E.2d 110, 111 (2003). In another South Carolina disciplinary case, an attorney was publicly reprimanded for engaging in a sexual relationship with his client's wife and failing to terminate representation of the client. In re Munden, 348 S.C. 231, 559 S.E.2d 589, 590 (2002). See also In re Reynolds, 335 S.C. 165, 515 S.E.2d 927, 927-28 (1999).
In a California case, a petition for habeas corpus was granted to a defendant whose defense counsel "maintained a covert sexual relationship with his wife" and advised the defendant's wife of her potential liability arising from the underlying murder charge against her present husband. People v. Singer, 226 Cal.App.3d 23, 275 Cal.Rptr. 911, 916-19 (1990). The court recognized that while "[t]here appears to be no direct precedent holding that an affair with a client's spouse raises a conflict of interest ... such a conclusion is inescapable." Id. at 921. In that case involving a sexual relationship between the wife and the lawyer during the course of two trials in a case in which the wife's former husband was the victim, the court found that "[g]iven the instant facts, a defense attorney, in the extreme, might be influenced to see his client convicted and imprisoned so that the affair can continue or remain undiscovered" and ruled that the sexual relationship between defense *257 counsel and the defendant's wife "deprived defendant of his constitutional right to the `undivided loyalty and effort' of his attorney." Ibid. (quoting Maxwell v. Superior Court, 30 Cal. 3d 606, 612, 180 Cal.Rptr. 177, 639 P.2d 248, 251 (Cal.1982)). The court stressed that in such a situation, "the professional attorney-client relationship becomes tainted and interwoven with a romantic relationship" and, regardless of whether defense counsel's representation was in fact hindered by a lack of vigilant representation, "a defendant is prejudiced by failing to have counsel unencumbered by potential divided loyalties." Id. at 922. See also State v. Stough, 96 Wash.App. 480, 980 P.2d 298, 301-02, review denied, 139 Wash.2d 1011, 994 P.2d 846 (1999), where the defendant was permitted to withdraw a guilty plea entered during the period in which she was having a sexual relationship with her defense counsel. Compare Barentine v. United States, 728 F.Supp. 1241, 1252 (W.D.N.C.), aff'd o.b., 908 F.2d 968 (4th Cir.1990) (no claim of error in handling of trial); Hernandez v. State, 750 So.2d 50, 52-55 (Fla.Dist.Ct. App.), vacated on rehearing, 750 So.2d 55 (Fla.Dist.Ct.App.1999) (en banc), pet. for habeas corpus denied, Hernandez v. Spears, 2002 WL 1205058 (S.D.Fla.2002) (defendant failed to establish that defense counsel's sexual relationship with defendant's wife during trial affected conviction of misdemeanor upon acquittal of felony).
This case involves unethical conduct irrespective of whether a traditional conflict of interest is involved. See RPC 1.7, 8.4. Although the relationship here was with the client's mother, not the defendant, the mother was encouraging the juvenile defendant to plead guilty and put the case behind him. The defendant was a juvenile when the act was committed, and there is special significance to the need for parental support in these circumstances. See State ex rel. Q.N., 179 N.J. 165, 172-74, 843 A.2d 1140 (2004); State v. Presha, 163 N.J. 304, 314-17, 748 A.2d 1108 (2000).
The PCR record sufficiently demonstrates that defendant's reliance on his mother's advice combined with his mother's relationship with defendant's counsel before sentence was imposed warrant the grant of post-conviction relief. Accordingly, the defendant may withdraw his guilty plea.[2] If he does so, all charges may be resurrected and presented to a grand jury.
Particularly in light of the PCR judge's finding that the sexual relationship occurred after the plea was entered, we add the following. It may be that the negotiated disposition was beneficial to defendant and that he may decide not to withdraw his plea. See, e.g., State v. Cheung, 328 N.J.Super. 368, 370, 746 A.2d 38 (App.Div. 2000); State v. Staten, 327 N.J.Super. 349, 359-60, 743 A.2d 365 (App.Div.), certif. denied, 164 N.J. 561, 753 A.2d 1153 (2000). That should be a decision for defendant to make after receiving the advice of counsel with a duty of loyalty only to him.

III.
The matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] As we noted in the opinion, defendant did not seek to withdraw the waiver determination, undoubtedly because of the standards for waiver of a homicide case at the time of the waiver hearing and not the fact that the sexual relationship had not commenced at that time.
[2] Given our conclusion, the PCR relief cannot be limited to the right to move to withdraw the plea, nunc pro tunc.