**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2637-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

SHIQUAN D. BELLAMY,

      Defendant-Appellant.

_____

        Submitted November 13, 2024 – Decided March 14, 2025

        Before Judges Sumners and Susswein.

        On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 11-03-0348.

        Jennifer N. Sellitti, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

        Matthew J. Platkin, Attorney General, attorney for respondent (Ian C. Kennedy, Special Deputy Attorney General, of counsel and on the brief).

        Appellant filed a pro se supplemental brief.

PER CURIAM

This post-conviction relief (PCR) matter returns to us after we remanded for an evidentiary hearing. After his first trial resulted in a hung jury, defendant Shiquan Bellamy was convicted at a second trial for multiple counts of knowing/purposeful murder, felony murder, carjacking, robbery, and weapons offenses. He contends in his current petition for PCR that he was denied effective assistance of counsel because of a conflict of interest arising from the fact that shortly after the second jury trial, defendant's attorney, Michael P. Rubas, started dating and eventually married Hudson County Prosecutor Office's (HCPO) Homicide/Crime Scene Detective, Erin Burns,[1] who testified for the State at both trials.

On direct appeal, we affirmed the trial convictions. Although we acknowledged defendant's conflict-of-interest argument, because of the scant record, we instructed defendant to bring this claim in a PCR proceeding. His ensuing PCR petition was initially denied without an evidentiary hearing. On appeal, we remanded, instructing the PCR court to hold an evidentiary hearing. A different PCR judge, Judge John A. Young, Jr., convened that hearing and found Rubas' and Burns' testimony to be credible. Judge Young found that the romantic relationship started after the second trial concluded and had no effect

[1] To avoid confusion, we use the detective's maiden name.

on Burns' performance as defense counsel. After carefully reviewing the record in light of the parties' arguments and governing legal principles, we affirm the denial of defendant's PCR petition substantially for the reasons set forth in Judge Young's written opinion.

I.

We discern the following pertinent facts and procedural history from the record. In March 2011, defendant and co-defendants, Latonia Bellamy and Darmelia Lawrence,[2] were charged by indictment with numerous counts arising from a carjacking that resulted in the death of two victims. Defendant was charged with two counts of knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1) or (2); four counts of felony murder, N.J.S.A. 2C:11-3(a)(3); two counts of first-degree carjacking, N.J.S.A. 2C:15-2; two counts of first-degree robbery, N.J.S.A. 2C:15-1; four counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree possession of a sawed-off shotgun, N.J.S.A. 2C:39-3(b); second-degree unlawful possession of a handgun,

---

[2] Latonia Bellamy was tried separately and convicted of murder. State v. Bellamy, 468 N.J. Super. 29, 35 (App. Div. 2021). Darmelia Lawrence pled guilty to two counts of robbery pursuant to a plea agreement in which she agreed to cooperate in the prosecution of defendant. See State v. Bellamy (Bellamy I), No. A-3369-13 (App. Div. Apr. 18, 2017) (slip op. at 5 n.2).

A-2637-22

N.J.S.A. 2C:39-5(b); and second-degree conspiracy to commit robbery, N.J.S.A. 2C:15-1 and 2C:5-2.

Defendant was initially tried in March 2013. That trial ended with a hung jury. Retrial was held in September 2013. At the second trial, the jury was presented with evidence that defendant, Latonia,[3] and Lawrence participated in a carjacking and robbery that resulted in the death of Michael Muchioki and Nia Haqq. We need not in this opinion recount the circumstances of the crime and incriminating evidence adduced at trial, which is thoroughly described in our prior direct-appeal and PCR opinions. Bellamy I, slip. op. at 2-23; State v. Bellamy (Bellamy II), No. A-2916-18 (App. Div. June 5, 2020) (slip op. at 2-5). It is sufficient for present purposes to summarize the role Burns played as a trial witness.

Burns testified that she retrieved three 9-millimeter casings from the crime scene and believed a shotgun caused Muchioki's head wound. Burns explained how the bullets were fired and which victim may have been shot first. She also testified that she found two fingerprints belonging to Lawrence on the carjacked vehicle. She stated there was pollen and dust on the vehicle that made it difficult to recover fingerprints, so only two useable prints were found.

---

[3] To avoid confusion with defendant, we use Latonia Bellamy's first name.

Burns further testified that there were no visible marks on the shotgun shells to warrant checking them for fingerprints, but that she swabbed the gun barrel for DNA in case there had been "blowback" from the closely-delivered shot. She examined the shotgun but found no fingerprints on it. Burns testified that it looked like the gun may have been "wiped down." She also testified that police recovered credit cards and identification belonging to Haqq. The police recovered the items from a neighbor who lived nearby the crime scene that turned them over to police after another neighbor dropped them off, thinking they might have belonged to his wife or a friend of theirs.

The jury returned a guilty verdict on all counts. On January 17, 2014, the trial court sentenced defendant to two consecutive life terms on the first-degree murder convictions and imposed concurrent prison terms on the remaining convictions.

On direct appeal, we affirmed defendant's convictions and sentence, issuing an opinion on April 18, 2017. As noted, we declined to consider defendant's conflict-of-interest contention regarding the relationship between Rubas and Burns, leaving that issue for a PCR petition. Bellamy I, slip op. at 23. We explained:

> In his third argument, defendant expresses concern about the undisputed fact, not otherwise explored in the

A-2637-22

trial court, that his attorney, [Rubas], entered into a dating relationship—no later than nine days after the jury verdict—with [Burns], who testified for the State and against defendant in this matter. That this relationship created a conflict of interest for defense counsel at the moment it commenced is not disputed; indeed, the conflict is self-evident.

[Bellmay I, slip op. at 20 (internal citations omitted).]

We added:

In short, because we have insufficient factual information from which to form a belief about whether Rubas was in a conflict of interest at a point earlier than nine days after the jury verdict, or whether substituted counsel was ineffective in failing to explore the matter more zealously than the record on appeal suggests, we leave the question for later consideration by way of a PCR petition. It suffices, in disposing of defendant's [p]oint II, that the judge did not err by failing to conduct an evidentiary hearing into the Rubas-Burns relationship that defendant never sought.

[Bellamy I, slip. op. at 23.]

In October 2017, the Supreme Court denied defendant's petition for certification. State v. Bellamy, 231 N.J. 115 (2017). A month later, defendant filed a PCR petition in accordance with our direct-appeal opinion.

On November 26, 2018, the first PCR judge heard oral argument, but did not convene an evidentiary hearing. On January 15, 2019, the judge issued a written opinion and order denying defendant's PCR petition.

On appeal, we affirmed in part and reversed in part, concluding:

> [W]e reject all defendant's arguments that the judge erred in denying post-conviction relief with the exception that we agree the judge erred by failing to conduct an evidentiary hearing about the relationship between defendant's trial counsel and [Burns], a witness for the prosecution, as to which we remand for an evidentiary hearing.
>
> [Bellamy II, slip op. at 16.]

On remand, Judge Young convened the evidentiary hearing on June 16, 2022 and January 5, 2023. The following facts were adduced at the evidentiary hearing:

Rubas testified that during his career, he did "pool" and per diem work for the Hudson County Public Defender's Office (HCPDO). In 2010 or 2011, the HCPDO assigned him to represent defendant in three cases involving five homicides. Only one of these three homicide cases went to trial. Defendant's first trial occurred in March 2013 and his second trial ended on September 19, 2013. Rubas cross-examined Burns in both trials.

Rubas testified that the first time he ever spoke with Burns was outside the courtroom on September 19, 2013, minutes after the jury returned a guilty verdict in defendant's second trial. Burns was in the hallway, talking with a group of detectives and attorneys. Rubas asked if anyone was going to lunch

because, as he explained, the relationship between the criminal defense bar and the HCPO was "very collegial" in 2013. Burns responded she could not go because she was traveling to North Carolina. Rubas handed her his business card, a choice that he testified he made after encountering the group in the hallway and it was not planned or premeditated. He further testified that he did not have any romantic or sexual intentions when he gave Burns his card. He reasoned that he did not provide his business card to the other detectives because he previously knew them.

Rubas next spoke with Burns on September 22, 2013 when she called him. They spoke a couple of times that week and went on their first date six days later. When asked if this was "the beginning of a relationship," Rubas testified that, at that point, he "wouldn't say [it was productive] towards a relationship. We were talking. We were interested in each other as people." Before their first date, they did not have any social media or email interactions.

Rubas acknowledged he was still assigned to represent defendant when he went on his first date with Burns. However, he did not do any legal work for defendant between the end of the trial and the first date. He informed the HCPDO and the first assistant prosecutor immediately after their date since that is when Rubas believed the conflict arose. The HCPDO informed Rubas that

defendant's case would be assigned to different counsel. The first assistant prosecutor instructed Rubas to save his cell phone records and put them in an envelope, which he did.

Rubas testified that he also signed a conflict letter from the HCPDO, which stated he was no longer able to be assigned to homicide cases and sexual assault cases that the prosecutor's homicide unit or crime scene unit investigated.

Rubas testified that he did not notify defendant because it was determined the best decision was for him to step down from further involvement with defendant and new counsel be assigned. The HCPDO assigned Roy Greenman to replace Rubas as defendant's counsel. Rubas sent a letter to Greenman, stating there was no dating relationship between himself and Burns during his representation of defendant.

The phone records preserved by Rubas showed no calls between him and Burns occurred from July 2013 to September 21, 2013. The records indicated they first spoke on the telephone on September 22, when Burns called Rubas. In addition, Rubas testified that he had no social media communications or text messages with Burns after defendant's first trial and before or during defendant's second trial. He further denied having any discussions outside the courtroom of any "potential dating or getting together situation with" Burns.

A-2637-22

When asked at the hearing whether he "change[d] [his] advocacy for [defendant] in any way as a result of [Burns] testifying," Rubas replied, "[n]ot at all. In fact, dealing with different issues due to new evidence but, no, not at all." When asked whether he "feel[s] that [his] representation of [defendant] [at the second trial] was equal to the representation [he] provided in the first trial," Rubas replied:

> Absolutely, 100 percent and I say this with that caveat. The Appellate Division has noted that there was overwhelming evidence of [defendant]'s guilt. I hung them [, the jury]. I hung it, mistrial, against a veteran prosecutor the first time. Then, within a couple of weeks after the first trial, I received two new issues. One, we received new DNA evidence. For the first time, there was DNA from the victims found on the jacket that was found and recovered at the scene and, also, unbeknownst to me, the prosecutor—the State . . . went to the jail and received handwriting exemplars from [defendant].
>
>    . . . .
>
> [A]t the second trial, I was dealing with a whole new set of DNA evidence, DNA evidence that I thought that was devasting to [defendant]'s case.

Rubas testified that he and Burns got engaged on March 28, and married on October 10, 2014.

Burns also testified at the January 5, 2023 evidentiary hearing. She testified that in 2013, she had been a detective in the Homicide Unit of the HCPO

for approximately three years. In that capacity, she conducted crime scene investigations, among other duties. Burns testified at both of defendant's trials. She denied having any contact with Rubas during either of the trials other than the cross-examinations. She recalled standing in the courthouse hallway with a few of her colleagues and other attorneys after the guilty verdict and she declined going to lunch due to her travel plans. She remembered that Rubas gave her his business card to contact him if she and the other detectives decided to go to lunch. She perceived this act as "just professional and friendly."

Burns testified that she traveled to North Carolina to visit her father and first spoke with Rubas on the phone within a week of their initial interaction. She could not recall the exact date but remembered that she called Rubas to ask if the group had gone out to celebrate. She recalled that they engaged in a "normal conversation." When asked whether it would "be fair to say it was maybe an introductory way of speaking to [Rubas] to go out further with him and explore a relationship," she responded, "[n]o. Not at that point."

Burns confirmed their first date was on September 28, 2013. She stated they went to a restaurant and Rubas dropped her off at her home afterwards.

Burns recalled that she first informed the first assistant prosecutor about the relationship around the time of her second date. The first assistant

11

prosecutor believed that so long as they continued to date, Rubas could not represent any defendants in homicides "or anything in that regard."

Judge Young considered the testimony, oral arguments, trial transcripts, and phone records. He issued a fourteen-page written opinion in February 2023 denying defendant's PCR petition. The judge found Rubas' and Burns' testimony were "forthright and credible," noting their testimonies "lack[ed] any major inconsistencies. Nor did their separate testimony uncover any fact omitted by one but told by the other." He also determined that no evidence demonstrated they "had any relationship whatsoever prior to [their] phone call on September 22, 2013."

Based on the foregoing PCR hearing testimony, Judge Young found:

> [Rubas] also testified his decision to hand [Burns] his business card was made after encountering the group in the hallway and was not planned or premeditated. He further testified he did not provide his business card to the other detectives because he previously knew them.
>
> . . . .
>
> [Burns] declined because she had to prepare to travel to North Carolina to visit her father. At that time, [Rubas] gave her his business card and told the group to let him know if they decided to go to lunch or for drinks. [Burns] did not suspect any motive in [Rubas] handing

12

her his business card except to be collegial, friendly, and professional.

The judge also made findings regarding Rubas' trial advocacy:

> [Rubas] testified that he believed he was effective in his representation of [d]efendant in both trials. [Rubas] referenced that the Appellate Division noted that overwhelming evidence existed for [d]efendant's guilt, yet he was able to obtain a hung jury on behalf of [d]efendant despite the evidence against [d]efendant. [Rubas] also testified that after the first trial, new DNA evidence emerged from a jacket found at the scene and handwriting exemplars were obtained from [d]efendant. [Rubas] described the new DNA evidence as "devastating" for [d]efendant.
>
> . . . .
>
> [Rubas] further testified he did not in any way change his advocacy of [d]efendant or alter his cross-examination of [Burns]. . . . the transcripts from [d]efendant's first and second trials were admitted into evidence and reviewed by this [c]ourt.

Furthermore, Judge Young compared counsel's cross-examination of Burns in the first and second trials, finding:

> [T]he transcripts from both [d]efendant's trials show [Rubas'] cross-examination of [Burns]was identical. The only difference in [his] questioning occurred when [Rubas] additionally questioned [Burns] based on the new DNA evidence at issue in the second trial. [Rubas'] objections had equally proper basis in both trials. No demonstrable change in trial strategy, questioning of witnesses, or competent objections can be found in reviewing the trial transcripts.

13

Judge Young ultimately concluded:

> No evidence has been uncovered as a result of the evidentiary hearing that demonstrates the relationship between [Rubas] and [Burns], began at any time prior to the verdict in [d]efendant's second trial, resulted in any ineffective assistance of counsel or effected the efficacy of [Rubas'] rigorous representation of [d]efendant. Nor did any testimony or admitted evidence during the evidentiary hearing give rise to a reasonable probability that [Rubas'] relationship with [Burns] undermines confidence in [d]efendant's trial, the jury verdict, or in any way effected [d]efendant's sentencing.

Judge Young also found there was no communication between Burns and Rubas during or in between the two trials. The judge explained that:

> The first meeting and few subsequent meetings prior to [Rubas] being relieved in early October 2013 demonstrate the very beginning stage of a romantic relationship. In the time after the verdict and [Rubas] being relieved, [Rubas] testified he conducted no legal work o[n] behalf of [d]efendant except being counsel of record.

He noted that Rubas withdrew as trial counsel prior to defendant's sentencing hearing on January 17, 2014.

Judge Young explained that the present situation was distinguishable from State v. Lasane, 371 N.J. Super. 151 (App. Div. 2004)—case relied upon by defendant—based on three facts:

14

(1) No relationship existed between [Rubas] and [Burns] before or during [d]efendant's second trial, unlike in Lasane, where a relationship existed before the sexual encounter between defense counsel and [the] defendant's mother which effected [the] defendant's guilty plea; (2) [Rubas] was relieved as counsel in October 2013, months before [d]efendant was sentenced, while in Lasane defense counsel continued to represent [the] defendant until and at his sentencing; and (3) [d]efendant did not rely on trial counsel at the time any contact between [Rubas] and [Burns] occurred, but in Lasane [the] defendant relied on defense counsel and his mother's advice/coercion to plead guilty.

Judge Young found that no evidence gave rise "to a reasonable probability that trial counsel's relationship with [Burns] undermines confidence in [d]efendant's trial, the jury verdict, or in any way effected [d]efendant's sentencing." Accordingly, he concluded defendant was not deprived of his right to counsel.

This appeal followed. Defendant raises the following contentions for our consideration in his counselled appeal brief:

POINT I

THE CONFLICT OF INTEREST BETWEEN TRIAL COUNSEL AND [BURNS], A STATE'S WITNESS, CONSTITUTED INEFFECTIVENESS OF COUNSEL, AND MANDATES THAT DEFENDANT'S CONVICTIONS BE REVERSED.

15

Defendant also raises the following contention in his supplemental pro-se brief:

> POINT I
>
> THE COURT FOR [PCR] ERRED IN DENYING [DEFENDANT] RELIEF WHERE THE SUPERIOR COURT APPELLATE DIVISION ON PCR APPEAL GRANTED AN EVIDENTIARY HEARING INTO THE CONFLICT OF INTEREST CLAIM ARGUED AGAINST TRIAL COUNSEL FOR HIS RELATIONSHIP WITH A DETECTIVE WHO WORKED FOR THE STATE AND WAS A LEADING WITNESS AT BOTH DEFENDANT'S TRIAL[]S.

## II.

We begin our analysis by acknowledging the general legal principles that govern this appeal. PCR serves the same function as a federal writ of habeas corpus. State v. Preciose, 129 N.J. 451, 459 (1992). When petitioning for PCR, a petitioner must establish, by a preponderance of the credible evidence, that they are entitled to the requested relief. Ibid. To meet this burden, the petitioner must allege and articulate specific facts, "which, if believed, would provide the court with an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992).

Both the Sixth Amendment of the United States Constitution and Article 1, paragraph 10 of the State Constitution guarantee the right to effective

16

assistance of counsel at all stages of criminal proceedings. Strickland v. Washington, 466 U.S. 668, 686 (1984) (citing McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). In addressing an ineffective assistance of counsel claim raised in a petition for PCR, New Jersey courts follow the two-part test articulated in Strickland, 466 U.S. at 687. See State v. Fritz, 105 N.J. 42, 58 (1987). "First, the defendant must show that counsel's performance was deficient." State v. Gideon, 244 N.J. 538, 550 (2021) (quoting Strickland, 466 U.S. at 687). "Second, the defendant must have been prejudiced by counsel's deficient performance." Ibid. (quoting Strickland, 466 U.S. at 687).

To meet the first prong of the Strickland/Fritz test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Reviewing courts indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

The second Strickland prong requires the defendant to show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Stated differently, counsel's errors must create a "reasonable probability" that the outcome of the

proceedings would have been different if counsel had not made the errors. Id. at 694. This "is an exacting standard." Gideon, 244 N.J. at 551 (quoting State v. Allegro, 193 N.J. 352, 367 (2008)).

Our review of whether a defendant was deprived the right to effective assistance of counsel is not confined to an examination of the professional decisions made by counsel. Depending on the circumstances, a defendant's constitutional rights can be violated by even the most competent attorney if the attorney has a conflict of interest. "Under our State Constitution, [e]ffective counsel is an attorney who represents [their] client with undivided loyalty, unimpaired by conflicting interests." State v. Cottle, 194 N.J. 449, 466-67 (2008) (alteration in original) (internal quotation marks omitted) (quoting State v. Norman, 151 N.J. 5, 23 (1997)). "[A]n attorney hobbled by conflicting interests that so thoroughly impede [their] ability to exercise single-minded loyalty on behalf of the client cannot render the effective assistance guaranteed by our constitution." Id. at 467. Further, "[o]ur Court's rulings have exhibited a much lower tolerance for conflict-ridden representation under the New Jersey Constitution than federal courts have under the United States Constitution." Id. at 470. New Jersey has "parted ways with the federal courts, which have

generally eschewed finding per se conflicts under the Sixth Amendment." Ibid.; cf. Mickens v. Taylor, 535 U.S. 162, 122 (2002).

Specifically, New Jersey courts "have adhered to a two-tiered approach in analyzing whether a conflict of interest has deprived a defendant of [their] state constitutional right to the effective assistance of counsel." Id. at 467 (citing Norman, 151 N.J. at 24-25). "Under the first tier, '[i]f a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants, a per se conflict arises, and prejudice will be presumed, absent a valid waiver.'" State v. Drisco, 355 N.J. Super. 283, 292 (App. Div. 2002) (alteration in original) (quoting Norman, 151 N.J. at 24-25). "'Otherwise,' under the second tier, 'the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown in that particular case to establish constitutionally defective representation of counsel.'" Ibid. (quoting Norman, 151 N.J. at 25); see also State v. Bell, 90 N.J. 163, 171 (1982).

"But not every potential attorney conflict rises to such an unacceptable level that it deprives a defendant of the right to effective assistance of counsel." State v. Murray, 162 N.J. 240, 249-50 (2000). "The relevant inquiry in potential conflict of interest situations is the potential impact the alleged conflict will

likely have upon defendant." Ibid. There are a limited class of cases recognized as "per se conflicts." See State v. Bellucci, 81 N.J. 531 (1980); Norman, 151 N.J. at 28; Cottle, 194 N.J. at 467, 473. "The per se rule is necessary because '[t]he harmful effects of a conflict . . . will not ordinarily be identifiable on the record,' and because, without a per se rule, '[r]equiring a showing of prejudice would place an impossible burden on the accused and force the reviewing courts to engage in "unguided speculation."'" State v. Alexander, 403 N.J. Super. 250, 257 (App. Div. 2008) (alteration in original) (internal citation omitted) (first quoting Bellucci, 81 N.J. at 543; and then quoting Norman, 151 N.J. at 24). For example, when "a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants," before, during, or after trial there is a per se conflict, and, absent a valid waiver, the reversal of a conviction is mandated. See id. at 255-56 (quoting Norman, 151 N.J. at 24–25, 28).

We find further helpful instruction on these conflict-of-interest issues in our decision in Lasane, 371 N.J. Super. at 151. In Lasane, a seventeen-year-old defendant entered into a guilty plea with the advice of his mother who had sexual-relations with defense counsel. Id. at 166-67. We permitted the defendant to withdraw his guilty plea and remanded for a new decision with the

opportunity to do so with advice of counsel who had a duty of loyalty solely to him. Ibid. We reasoned:

> Although it is not disputed that defense counsel did, in fact, have a sexual relationship with [the] defendant's mother, the judge found that it occurred after the defendant's guilty plea, which the State argues is factually significant. And, while we have reservations about the credibility of defense counsel because of the personal and ethical consequences of his actions, the PCR judge recognized that fact, and we are constrained by the trial judge's determination of credibility.
>
> In any event, the relationship occurred before defendant was sentenced and at a time when the trial judge had to view a motion to withdraw the plea with some liberality. . . . Moreover, it is undisputed that [the] defendant's mother counseled her young son to plead guilty and maintained that position until the PCR petition was filed. Furthermore, it is not suggested that the attorney and mother engaged in sexual intercourse on their first encounter, without having developed some relationship before the plea was entered.
>
> [Id. at 162-63 (internal citations omitted).]

Finally, by way of general legal principles, we emphasize that appellate courts defer to a PCR court's factual findings "when supported by adequate, substantial and credible evidence." State v. Harris, 181 N.J. 391, 415 (2004) (quoting Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)). For mixed questions of law and fact, the court gives deference to the supported factual findings of the trial court but review de novo the lower court's application

21

of the law to those facts.  Id. at 416 (quoting State v. Marshall, 148 N.J. 89, 185 (1997)).

III.

We next apply the foregoing principles to the matter before us.  Defendant argues the relationship between Rubas and Burns constitutes a per se conflict of interest that requires us to reverse his convictions and remand for a new trial. In his pro se submission, defendant asserts that:

> a defense attorney who is actively representing a criminal defendant is simultaneously interested in pursuing a dating or sexual relationship with a detective from the prosecutor's office who is also a witness in that same case would be a per se conflict of interest on the same level as those decried in Norman[, 151 N.J. at 5] and Cottle[, 194 N.J. at 449].

We are unpersuaded the situation before us constitutes a per se conflict of interest.  The critical fact, as found by Judge Young based on his assessment of the credibility of Rubas and Burns at the evidentiary hearing, is that they did not begin their dating relationship until after the second trial was completed, and Rubas performed no legal services for defendant after the trial.  We also have no basis upon which to overturn Judge Young's factual finding, again based on his credibility assessment of the live witnesses who appeared at the evidentiary

22

hearing, that Rubas did not have intentions to have a romantic relationship with Burns until after the second trial was completed.

A close review of the record shows that the critical question of when Rubas decided to pursue Burns romantically was painstakingly explored on cross-examination at the PCR hearing and was addressed in the judge's factual findings and ultimate ruling. We reproduce the relevant part of the cross-examination of Rubas:

> Q: When you handed her your business card, did you have any romantic or sexual intentions when you handed her your business card?
>
> A: No. As I just said, you know, Hudson at that time was a very collegial place. It was common for—we had softball games with the [p]rosecutor's [o]ffice. We would go to happy hours together. There was a collegial place—it was a place where you can come and go into court and fight extremely hard for your clients but then, at the same time, recognize that there's a life outside the office. So, it was a collegial place. So, there were no intentions. It was just like, are you guys going out to lunch.
>
> . . . .
>
> Q: Did you at any time speak to [Burns] outside of the courtroom, let's say, on September 18th in any way to discuss any potential dating or getting together situation with her?
>
> A: Absolutely not.

23

. . . .

Q: . . . At some point, though, to take that step to hand her [your] card, when did you make that decision that you were going to hand her your card, that same day?

A: Outside—outside in the hall when we were discussing if people were going to go have lunch.

Q: Okay. You had no thought about talking to her or sending your card to her on September 17th or September 16th or September 15th?

A: No.

Q: Now, when you decided to give her your card, what was your thinking process at that time?

A: My thinking process is what I explained earlier. Back at that time, this was a very collegial environment. Members of the law enforcement, prosecutors,— detectives and prosecutors, we would all interact socially and the thought was that, I asked them if they were going to lunch at a certain establishment in Jersey City and they were talking about it and she said, she might and then I handed my card and she actually then said, she is actually going to North Carolina. So, I mean, that's how it developed. That's what happened. There was not really much more to it. It's very simple.

Q: It's a little simple but you actually had more than just the idea of taking her out to lunch? You were looking for some potential relationship with her. Would that be fair to say?

A: No. Not at all. I don't—I don't—every person I give my card to, I'm not looking to enter into a potential relationship. No.

24

As we have noted, Judge Young accredited Rubas' testimony and we have no basis upon which to second-guess his credibility assessment. Further, we concur with Judge Young's determination that the present situation is distinguishable from the facts in Lasane. In sum, we are satisfied from our own review of the record that a conflict-of-interest did not arise before or during the second trial. Likewise, we are satisfied that defendant at trial received the benefit of competent, zealous representation in the face of overwhelming evidence of guilt, including incriminating DNA evidence that was not available at the time of the first trial. We thus conclude that defendant has established neither prong of the two-part Strickland/Fritz PCR test.

Nor are we persuaded by the argument raised in defendant's pro se brief that he has suffered a fundamental injustice pursuant to Rule 901(3)(4) and Rule 3:22-4(a)(2). "To succeed on a fundamental-injustice claim," the PCR petitioner "must make '"some showing"' that an error or violation '"played a role in the determination of guilt."'" State v. Nash, 212 N.J. 518, 547 (2013) (quoting State v. Marshall, 173 N.J. 343, 354 (2002)). Defendant has made no such showing.

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

A-2637-22

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M. C. Harley*

Clerk of the Appellate Division

26